**[J-16-2025]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | |
|---|---|
| INTERSTATE GAS SUPPLY, INC. D/B/A IGS ENERGY, NRG ENERGY, INC. AND SHIPLEY CHOICE LLC D/B/A SHIPLEY ENERGY, | : No. 10 MAP 2024<br>:<br>: Appeal from the Order of the<br>: Commonwealth Court at<br>: No. 472 CD 2022 entered on |
| Appellants | : April 28, 2023, affirming the Order of<br>: the Public Utility Commission at Nos.<br>: C-2019-3013805, C-2019-3013806, |
| v. | : C-2019-3013807 and C-2019-<br>: 3013808 entered April 14, 2022.<br>: |
| PUBLIC UTILITY COMMISSION, | : ARGUED: April 8, 2025<br>: |
| Appellee | : |

**OPINION**

**JUSTICE BROBSON** **DECIDED: September 25, 2025**

Section 1502 of the Public Utility Code (Code), 66 Pa. C.S. § 1502, and Section 2804(6) of the Electricity Generation Customer Choice and Competition Act (Competition Act),[1] 66 Pa. C.S. § 2804(6), prohibit discrimination in the provision of service under the Code. In this discretionary appeal, we must decide whether the Commonwealth Court properly concluded that an electric distribution company may utilize a specific billing practice known as "on-bill billing" to offer its own non-commodity goods and services to customers while denying electric generation suppliers the same billing option. For the reasons that follow, we affirm the Commonwealth Court.

_____

[1] The Competition Act is set forth within Chapter 28 of the Code, 66 Pa. C.S. §§ 2801-2815.

# I. BACKGROUND

There are two types of electricity providers in Pennsylvania: (1) electric distribution companies (EDCs); and (2) electric generation suppliers (EGSs). *Dauphin Cnty. Indus. Dev. Auth. v. Pa. Pub. Util. Comm'n*, 123 A.3d 1124, 1126 (Pa. Cmwlth. 2015), *appeal denied*, 140 A.3d 14 (Pa. 2016). Section 2803 of the Competition Act defines an "[EDC]" as:

> The public utility providing facilities for the jurisdictional transmission and distribution of electricity to retail customers, except building or facility owners/operators that manage the internal distribution system serving such building or facility and that supply electric power and other related electric power services to occupants of the building or facility.

66 Pa. C.S. § 2803. It further defines an "[EGS]," in relevant part, as:

> A person or corporation, including municipal corporations which choose to provide service outside their municipal limits except to the extent provided prior to the effective date of this chapter, brokers and marketers, aggregators or any other entities, that sells to end-use customers electricity or related services utilizing the jurisdictional transmission or distribution facilities of an [EDC] or that purchases, brokers, arranges or markets electricity or related services for sale to end-use customers utilizing the jurisdictional transmission and distribution facilities of an [EDC].

*Id.*

"Typically, in a given region, there is one [EDC]," which the Public Utility Commission (PUC) appoints as the default service provider for that region. *Dauphin Cnty. Indus. Dev. Auth.*, 123 A.3d at 1126. Electricity consumers are automatically enrolled as customers of that EDC. *Id.* Those consumers, however, "can also choose to purchase their electrical service from an alternative source, *i.e.*, an [EGS]." *Id.*; *see also* 66 Pa. C.S. § 2806(a) ("[A]ll customers of [EDCs] in this Commonwealth shall have the opportunity to purchase electricity from their choice of [EGSs]. The ultimate choice of the [EGS] is to rest with the consumer."). The EDCs "implement procedures to require all [EGSs] to deliver energy to the [EDC] at locations and in amounts which are adequate to

meet the [EGS's] obligations to its customers." 66 Pa. C.S. § 2807(a). As part of this process, EDCs may, at the discretion of the customer, "be responsible for billing customers for all electric services . . . regardless of the identity of the provider of those services"—*i.e.*, a customer who has opted to purchase electric generation supply service from an EGS may choose to receive one single bill from the EDC for all electric services or two separate bills, one from the EDC and one from the EGS. 66 Pa. C.S. § 2807(c).

This case pertains to a billing practice commonly known as "on-bill billing," wherein an electricity provider bills for non-commodity goods and services[2] it offers to its customers, such as smart thermostats, energy efficient light bulbs, surge protection, line repair programs, disaster protection plans, outdoor lighting, and professional tree cutting services. FirstEnergy Pennsylvania Electric Company (FirstEnergy),[3] an EDC, uses on-bill billing to offer its own non-commodity goods and services but does not offer the same billing option to EGSs. In response, several EGSs—namely, Interstate Gas Supply, Inc. d/b/a IGS Energy, NRG Energy, Inc., and Shipley Choice LLC d/b/a Shipley Energy (Appellants)—filed a complaint with the PUC, claiming that FirstEnergy's refusal to provide on-bill billing to Appellants' customers for Appellants' non-commodity goods and services constituted unlawful discrimination in violation of Section 1502 of the Code and Section 2804(6) of the Competition Act. Section 1502 provides:

> No public utility shall, as to service, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage. No public utility shall

---

[2] The parties use the term "non-commodity goods and services" to include all goods and services that are not the energy commodity, meaning all goods and services that are not electricity or required for the delivery thereof. (Appellants' Br. at 11 n.1.)

[3] FirstEnergy has at least four separate, subsidiary EDCs: Metropolitan Edison Company, Pennsylvania Electric Company, Pennsylvania Power Company, and West Penn Power Company. Those four separate, subsidiary EDCs were respondents before the PUC and intervenors before the Commonwealth Court.

establish or maintain any unreasonable difference as to service, either as between localities or as between classes of service, but this section does not prohibit the establishment of reasonable classifications of service.

66 Pa. C.S. § 1502.  Section 2804(6) of the Competition Act provides:

Consistent with the provision of [S]ection 2806, the commission shall require that a public utility that owns or operates jurisdictional transmission and distribution facilities shall provide transmission and distribution service to all retail electric customers in their service territory and to electric cooperative corporations and [EGSs], affiliated or nonaffiliated, on rates, terms of access and conditions that are comparable to the utility's own use of its system.

66 Pa. C.S. § 2804(6).

Appellants claimed that FirstEnergy's refusal to offer the option of on-bill billing to EGSs is analogous to the facts presented in *Pennsylvania Public Utility Commission v. Columbia Gas of Pennsylvania, Inc.* (*Columbia Gas*) (Pa. Pub. Util. Comm'n, No. R-2018-2647577, et. seq., filed December 6, 2018).  In that case, the PUC concluded that Columbia Gas's practice of providing on-bill billing to certain third parties and former affiliates of Columbia Gas, who were not natural gas suppliers, while denying that same option to natural gas suppliers was unreasonably discriminatory and in violation of Section 1502 of the Code and Section 2203(4) of the Natural Gas Choice and Competition Act (NG Competition Act), 66 Pa. C.S. § 2203(4).  Here, Appellants acknowledged that FirstEnergy does not provide the option for on-bill billing to any third party.  Appellants insisted, however, that this factual distinction did not alter the legal analysis or the relevancy of *Columbia Gas*.  Similarly, Appellants asserted that the relevant provisions in the NG Competition Act are sufficiently comparable to the Competition Act such that the two should be treated consistently.  Accordingly, Appellants maintained that FirstEnergy's exclusive on-bill billing practice constituted unlawful discrimination and asked the PUC to require FirstEnergy to provide on-bill billing to all EGSs on a nondiscriminatory basis and/or prohibit FirstEnergy from utilizing on-bill billing

entirely. In response, FirstEnergy explained that it denies on-bill billing to all similarly situated parties, *i.e.*, all third parties. In that way, FirstEnergy averred that its billing practice was not discriminatory.

The PUC assigned the matter to an administrative law judge (ALJ), who conducted an evidentiary hearing.[4] The ALJ issued a decision sustaining Appellants' complaint. In his findings of fact, the ALJ determined that FirstEnergy is permitted to utilize on-bill billing, that EGSs can and do bill separately for such non-commodity goods and services, and that the inclusion of non-commodity goods and services on FirstEnergy's bill provides a significant competitive advantage to FirstEnergy. Based upon these conclusions and the PUC's rationale in *Columbia Gas*, the ALJ concluded that FirstEnergy's billing practice violated both Section 1502 of the Code and Section 2804(6) of the Competition Act. FirstEnergy filed exceptions to the ALJ's decision.

In an opinion and order dated August 26, 2021, the PUC granted FirstEnergy's exceptions and reversed the ALJ's decision. The PUC primarily relied upon the reasoning that "[d]iscrimination arises only where the provision of service creates an unreasonable disparity between the parties to which the service may be provided." (PUC Op., 8/26/2021, at 25.) Accordingly, the PUC concluded that, "to find a violation of . . . Section 1502 [of the Code] . . . , [Appellants] would be required to show that [FirstEnergy] provide[s] the billing services in question to a third party (*i.e.*, a party other than [FirstEnergy itself]) while refusing to provide the same service to [Appellants]."[5] (*Id.*

---

[4] The Office of Consumer Advocate (OCA) filed a notice of intervention and provided testimony before the ALJ. The OCA also filed exceptions to the ALJ's decision, which the PUC denied. The OCA chose not to file a brief before this Court.

[5] In their petition for reconsideration, Appellants asserted that FirstEnergy provided on-bill billing for a third party. Upon review, however, the PUC determined that the third party at issue was contracted to serve as the program administrator for FirstEnergy's *own* non-commodity goods and services. (PUC Op., 4/14/2022, at 17.) Consequently, the PUC concluded that FirstEnergy was not providing on-bill billing to a third party. On (continued…)

at 22.)   In this respect, the PUC found *Columbia Gas* factually and materially distinguishable from the present matter.   In addition, the PUC interpreted Section 2804(6) of the Competition Act, which requires that an EDC provide EGSs with electric transmission and distribution service "on rates, terms of access and conditions that are comparable to the [EDC's] own use of its system."   66 Pa. C.S. § 2804(6). Ultimately, the PUC concluded that the section did not include billing services.   Instead, the PUC found that the mandate provided in Section 2804(6) "is limited to the narrower class of transmission and distribution facilities necessary for the transport of electricity" to the end-use customer.   (PUC Op., 8/26/2021, at 27.)   The PUC reached this conclusion in part by considering similar language included in the definition of "direct access" provided in Section 2803 of the Competition Act.[6]

In a published, *en banc* opinion, the Commonwealth Court affirmed the PUC's orders.   *See Interstate Gas Supply, Inc. v. Pub. Util. Comm'n*, 298 A.3d 1181 (Pa. Cmwlth. 2023) (en banc).   The Commonwealth Court rejected Appellants' interpretation of Section 1502 of the Code, because it concluded that "th[e] statute addresses the services public utilities offer *to* other entities, *not* . . . those which public utilities make available for their *own* use."   *Id.* at 1189 (emphases in original).   That reading, the

---

appeal, the Commonwealth Court concluded that the PUC did not abuse its discretion by denying the petition for reconsideration.  Appellants did not appeal this aspect of the Commonwealth Court's decision, and, accordingly, we do not address it further.

[6] Section 2803 of the Competition Act provides, in relevant part:

> "Direct access."  The right of [EGSs] and end-use customers to utilize and interconnect with the electric transmission and distribution system on a nondiscriminatory basis at rates, terms and conditions of service comparable to the transmission and distribution companies' own use of the system to transport electricity from any generator of electricity to any end-use customer.

66 Pa. C.S. § 2803.

Commonwealth Court reasoned, was further supported by Section 2804(6)'s provision requiring that an EDC provide EGSs with comparable use of its system in the EDC's provision of transmission and distribution service because, in the Commonwealth Court's view, "[s]uch a targeted directive would be unnecessary if Section 1502 broadly barred public utilities from refusing to offer [EGSs] the same level and kind of services with which public utilities provide themselves." *Id*. at 1190. In addition, the Commonwealth Court held that "Section 2807(c) of the Competition Act makes clear that on-bill billing for third-party services is not a mandatory burden imposed upon EDCs" and "Section 2804(6) of the Competition Act does not itself bar discrimination regarding non-commodity goods and services." *Id.* Thus, the Commonwealth Court concluded that the PUC's "interpretation of these laws in this context was . . . correct and, in addition, was not inconsistent with its decision in *Columbia* [*Gas*]." *Id*.

President Judge Cohn Jubelirer authored a dissenting opinion, which Judge McCullough joined, reasoning that Section 1502 of the Code "prohibits the provision of a preference or advantage to 'any corporation,' . . . and 'any' corporation should include the public utility itself, and not be limited to 'another' corporation." *Id.* at 1192 (Cohn Jubelirer, P.J., dissenting) (quoting 66 Pa. C.S. § 1502). President Judge Cohn Jubelirer opined that holding otherwise would be inconsistent with *Columbia Gas*. In addition, President Judge Cohn Jubelirer believed that the majority's interpretation is "contrary to the express language of [Section 2807(c) of] the Competition Act," which assigns to EDCs the default role for billing customers for all electric services regardless of the provider's identity. *Id*. at 1193 (citation omitted). President Judge Cohn Jubelirer further reasoned that billing services fell within the parameters of Section 2804(6) of the Competition Act because "'meter[ing] customer usage,' 'accumulat[ing] that data, and provid[ing] that data to [EGSs] to allow them to calculate customer bills' is part of the provision of distribution

services." *Id.* (alterations in original) (citing Appellants' Cmwlth. Ct. Reply Br. at 12-13). For these reasons, President Judge Cohn Jubelirer would have held that FirstEnergy's billing practice violated Section 1502 and Section 2804(6), thereby requiring FirstEnergy to stop the practice or provide it to all EGSs, including Appellants.

## II. ISSUE

Appellants filed a petition seeking this Court's discretionary review, which we granted to consider the following issue:

> Contrary to the plain language and intent of . . . Section 1502 [of the Code], . . . which prohibits a public utility from granting any advantage to any person or corporation, or subjecting any person or corporation to a disadvantage— and Section 2804(6) [of the Competition Act] . . . —which requires monopoly [EDCs] like [FirstEnergy] to provide distribution service to . . . [EGSs] like [Appellants] on "rates, terms of access and conditions that are comparable to the utility's own use of its system"—did the Commonwealth Court err as a matter of law by upholding the [PUC's] interpretation of those sections to allow [FirstEnergy] to include charges for its own "side" products and services on its utility bills but exclude charges for the same or similar products offered by [Appellants], where the PUC long ago held billing to be a part of public utility distribution service?

*Interstate Gas Supply, Inc. v. Pub. Util. Comm'n*, 314 A.3d 813 (Pa. 2024) (per curiam). As these issues involve matters of statutory interpretation, our standard of review is *de novo* and our scope of review is plenary. *S & H Transp., Inc. v. City of York*, 210 A.3d 1028, 1038 (Pa. 2019).

## III. DISCUSSION

The appeal requires us to interpret Section 1502 of the Code and Section 2804(6) of the Competition Act. We are guided in our analysis by the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa. C.S. §§ 1501-1991, which provides that the object of all statutory interpretation "is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). Generally, the plain language of the statute "provides the best indication of legislative intent." *Miller v. Cnty. of Centre*,

173 A.3d 1162, 1168 (Pa. 2017) (citing 1 Pa. C.S. § 1921(b)).  "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage," though "technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in [the Statutory Construction Act], shall be construed according to such peculiar and appropriate meaning or definition."  1 Pa. C.S. § 1903(a).  Furthermore, "[w]hen construing one section of a statute, courts must read that section not by itself, but with reference to, and in light of, the other sections." *Trust Under Agreement of Taylor*, 164 A.3d 1147, 1155 (Pa. 2017).  In other words, "[s]tatutory language must be read in context, 'together and in conjunction' with the remaining statutory language."  *Id.* (internal citation omitted); *see also* 1 Pa. C.S. § 1922(2) (presuming that "General Assembly intends the entire statute to be effective and certain.").

Section 1502 of the Code provides:

No public utility shall, as to service, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage.  No public utility shall establish or maintain any unreasonable difference as to service, either as between localities or as between classes of service, but this section does not prohibit the establishment of reasonable classifications of service.

66 Pa. C.S. § 1502.  The parties in this dispute provide competing interpretations of several clauses within Section 1502.  In particular, the parties present fulsome arguments on whether Section 1502 "prohibit[s] an EDC from providing *itself* with the benefit of a[n applicable] service not provided to its EGS competitors."  (Appellants' Br. at 22 (emphasis added).)  Before addressing this issue, however, we must establish whether an EDC's use of on-bill billing for non-commodity goods and services implicates Section 1502.  To do so, we first consider Section 1502's use of the phrase "as to service."

Section 102 of the Code defines "service," in relevant part, as:

"Service." Used in its broadest and most inclusive sense, includes any and all acts done, rendered, or performed, and any and all things furnished or supplied, and any and all facilities used, furnished, or supplied by public utilities, or contract carriers by motor vehicle, *in the performance of their duties under this part* to their patrons, employees, other public utilities, and the public . . . .

66 Pa. C.S. § 102 (emphasis added). By its plain language, this definition is both broad and inclusive. Notably, however, Section 102 limits its breadth by including only those "acts done, rendered, or performed, . . . things furnished or supplied, and . . . facilities used, furnished, or supplied by public utilities. . . *in the performance of their duties under this part*." *Id.* (emphasis added). As suggested by this language, the Code provides the duties contemplated. Pertinent here, Section 2807 of the Competition Act addresses "[d]uties of [EDCs]."[7] 66 Pa. C.S. § 2807. Indeed, Section 2807(c) includes several duties of an EDC related to "[c]ustomer billing." *Id.* It provides:

(c) Customer billing.--Subject to the right of an end-use customer to choose to receive separate bills from its [EGS], the [EDC] may be *responsible for billing customers for all electric services*, consistent with the regulations of the commission, regardless of the identity of the provider of those services.

(1) Customer bills shall contain unbundled charges sufficient to enable the customer to determine the basis for those charges.

(2) If services are provided by an entity other than the [EDC], the entity that provides those services shall furnish to the [EDC] billing data sufficient to enable the [EDC] to bill customers.

(3) The [EDC] shall not be required to forward payment to entities providing services to customers, and on whose behalf the [EDC] is billing those customers, before the [EDC] has received payment for those services from customers.

---

[7] The parties in this dispute refer only to Sections 2807(c) of the Competition Act and Section 1502 of the Code as the bases for an EDC's duty to provide on-bill billing. Our analysis is, accordingly, limited to those provisions.

*Id.* (emphasis added).

Read within the context of the Code's other provisions, the scope of Section 1502 of the Code is clear for the purposes of this appeal.[8] Put in simpler terms, Section 1502 prohibits a public utility from acting in a discriminatory manner in the performance of its duties under the Code. Section 2807(c) of the Competition Act provides that FirstEnergy, operating as an EDC, "may be responsible for billing customers for all electric services." *Id.* Consequently, Section 1502 clearly prohibits FirstEnergy from "mak[ing] or grant[ing] any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage" with respect to "[c]ustomer billing . . . for all *electric* services." 66 Pa. C.S. §§ 1502, 2807(c) (emphasis added).

Appellants challenge FirstEnergy's exclusive on-bill billing practice as discriminatory pursuant to Section 1502 of the Code. In so doing, Appellants argue that FirstEnergy's "[b]illing service is a 'service' as used in Section 1502." (Appellants' Br. at 23.) Upon review of the relevant statutory provisions, however, we conclude that Section 2807(c) does not provide a duty for an EDC to provide on-bill billing for an EGS, because the offering of non-commodity goods and services does not constitute an *electric* service. Appellants correctly identify that "[t]here is no definition of 'electric services' in the Code." (Appellants' Reply Br. at 17.) Section 2803 of the Competition Act does, however, reference various costs that an EDC is required to include on a customer's bill. For example, a "[c]ompetitive transition charge" is "[a] nonbypassable charge applied to

---

[8] The parties provide extensive arguments regarding what deference, if any, is owed to the PUC's interpretation of the relevant statutes. As we find these provisions plain and unambiguous in the context of this appeal, we do not address this issue. *See In re Tr. Under Deed of David P. Kulig Dated Jan. 12, 2001*, 175 A.3d 222, 230 (Pa. 2017) ("[W]e may not rely upon our various tools of statutory construction when the text of the statute, itself, is plain.").

the bill of every customer accessing the transmission and distribution network which (charge) is designed to recover an electric utility's transition or stranded costs as determined by the [PUC]." 66 Pa. C.S. § 2803. Section 2803 further defines "[t]ransition or stranded costs" as "[a]n electric utility's known and measurable net electric generation-related costs," including, *inter alia*, "[r]egulatory assets and other deferred charges;" "[p]rudently incurred costs related to cancellation, buyout, buydown or renegotiation of [certain] nonutility generating projects;" and some of the "[t]he utility's long-term purchase power commitments." *Id.* Section 2803 also contemplates that an EGS might sell, purchase, broker, arrange, or market "electricity or *related services* utilizing the jurisdictional transmission or distribution facilities of an [EDC]." *Id.* (emphasis added).

Based upon these definitions, it is clear that the "electric services" referenced in Section 2807(c) include more than the provision of electricity itself. In its brief before this Court, however, Appellants do not provide a developed argument on the boundaries of the term "electric services." Indeed, Appellant chose to use the terms "non-commodity" and "[n]on[][b]asic" to describe the goods and services at issue. (Appellants' Br. at 11 n.1.) Appellants also adopt the definition of "[n]onbasic services" provided by Section 56.2 of the PUC's regulations, 52 Pa. Code § 56.2. (*Id.* (stating that "[t]he term 'non-commodity' is used interchangeably" with "[n]on[]basic [s]ervices").) This definition provides that "[n]onbasic services" are "[o]ptional recurring services which are distinctly separate and clearly not required for the physical delivery of public utility service or default service," the latter of which is defined as "[e]lectric generation supply service provided under a default service program to a retail electric customer not receiving service from an [EGS]." 52 Pa. Code § 56.2.

It is apparent that *non-commodity* goods and services, by definition, cannot reasonably be considered a service of the commodity, *i.e.*, electricity. Similarly, the PUC's regulations define nonbasic services as "distinctly separate" from "the physical delivery of public utility service or default service." *Id.* By use of these terms, and in the absence of a developed argument to the contrary, Appellants fail to establish that the goods and services at issue are "electric services" under Section 2807(c) of the Competition Act. Accordingly, the on-bill billing of non-commodity goods and services at issue here falls outside of the scope of an EDC's duties relative to customer billing under Section 2807(c).

Appellants argue in the alternative that, "even if an EDC were only *required* to provide billing for electric services" under Section 2807(c) of the Competition Act, Section 1502 of the Code requires the EDC "to provide the same billing capability" to Appellants if the EDC opts to utilize on-bill billing for itself. (Appellant's Reply Br. at 17 (emphasis in original).) This reasoning is flawed. In essence, Appellants rely on Section 1502 to establish an EDC's duty to provide the option of on-bill billing to all EGSs. As discussed above, however, Section 1502's use of the phrase "as to service" indicates that Section 1502 is limited to "service," which is defined as those "acts done, rendered, or performed, . . . things furnished or supplied, and . . . facilities used, furnished, or supplied by public utilities . . . *in the performance of their duties under this part*." 66 Pa. C.S. § 102 (emphasis added). Consequently, Section 1502 cannot itself provide a duty where another does not already exist in the Code. As explained above, an EDC's duties relative to customer billing under Section 2807(c) are limited to "billing customers for all *electric* services," which by definition does not include *non-commodity* goods and services. 66 Pa. C.S. § 2807(c) (emphasis added). As such, Appellants have failed to provide a statutory basis for an EDC's duty to bill customers for these non-commodity

goods and services and, accordingly, Appellants have failed to establish that FirstEnergy's exclusive on-bill billing practice violates Section 1502.[9]

Appellants' claim regarding Section 2804(6) of the Competition Act fails for similar reasons. To reiterate, Section 2804(6) provides:

> Consistent with the provision of [S]ection 2806,[10] the commission shall require that a public utility that owns or operates jurisdictional transmission and distribution facilities shall provide *transmission and distribution service* to all retail electric customers in their service territory and to electric cooperative corporations and [EGSs], affiliated or nonaffiliated, on rates, terms of access and conditions that are comparable to the utility's own use of its system.

66 Pa. C.S. § 2804(6) (emphasis added). Section 2804(6), like Section 2807(c) of the Competition Act, uses more specific language than the term "service" as defined by Section 102 of the Code. Instead, Section 2804(6) discusses "*transmission and distribution* service." *Id.* (emphasis added). Appellants argue that providing billing for non-commodity goods and services "clearly is part of distribution service under Section 2804(6)." (Appellants' Br. at 36.) Under the usual definition of the term "distribution," this conclusion is arguable. In the context of the provision of electricity, however, "transmission" and "distribution" have peculiar, technical definitions.[11] By way of background:

---

[9] Having concluded that an EDC has no duty under the Code to provide on-bill billing to an EGS and, therefore, Section 1502 of the Code does not apply, we do not reach the questions of whether on-bill billing "provide[s] a benefit to [FirstEnergy] to the detriment of [Appellants]" or whether the Code "prohibit[s] an EDC from providing itself with the benefit of a[n applicable] service not provided to its EGS competitors." (Appellants' Br. at 22.) Consequently, we need not discuss the PUC's decision in *Columbia Gas* at this time.

[10] Section 2806 of the Competition Act provides for the implementation of the competitive electric market, including pilot programs and restructuring plans. *See* 66 Pa. C.S. § 2806.

[11] For example, the PUC provides an Electric Terms Dictionary online, which defines "[t]ransmission" as "[t]he movement of electricity from where it is produced to a local (continued…)

> Electric power is delivered to a home or business through the transmission and distribution system. The electric power transmission system transfers bulk electrical power from place to place, usually over long distances, through overhead power lines. . . . The power is then sent to the distribution system and eventually, after further stepdown in voltage, to customers.

*Lloyd v. Pa. Pub. Util. Comm'n*, 904 A.2d 1010, 1015 n.8 (Pa. Cmwlth. 2006). Thus, in layman's terms, transmission and distribution is the process of transporting electricity from the place it is generated to the end-use customer. This understanding of the phrase "transmission and distribution" aligns with other uses of the terms within the Competition Act. *See, e.g.*, 66 Pa. C.S. § 2802(16) (referring to "the transmission and distribution of electricity"); 66 Pa. C.S. § 2804(1)(ii) (referring to "transmission and distribution facilities"). For these reasons, the term "distribution" in Section 2804(6) must be "construed according to such peculiar and appropriate meaning or definition." 1 Pa. C.S. § 1903(a).

Appellants present no argument to suggest that the option for on-bill billing of non-commodity goods and services would qualify under this understanding of "transmission and distribution service." Appellants reject the PUC's similar understanding of the term distribution, however, by arguing that the PUC improperly "look[ed] to the definition of 'direct access'" under Section 2803 of the Competition Act to "limit[] the definition of 'distribution services' under Section 2804(6)." (Appellants' Br. at 26.) Whether Section 2803 is on point, however, is of no moment. The language of Section 2804(6) is clear when read within the context of the Competition Act and Appellants provide no support for their position that billing services constitute "distribution

___

distribution system." *Transmission*, Pa. Pub. Util. Comm'n Elec. Terms Dictionary, https://www.puc.pa.gov/electricity/electric-terms-dictionary (last visited July 25, 2025). "Distribution" is defined as "[t]he delivery of electricity to your home or business. This includes local wires, transformers, substations and other equipment used to deliver electricity to end-use consumers from the high-voltage transmission lines." *Distribution*, Pa. Pub. Util. Comm'n Electric Terms Dictionary, https://www.puc.pa.gov/electricity/electric-terms-dictionary (last visited July 25, 2025).

service" therein.[12] For this reason, and based upon the technical understanding of these terms, we conclude that the use of on-bill billing does not constitute "transmission and distribution service" as those terms are used within the Competition Act, and, therefore, the option for on-bill billing is outside of the purview of Section 2804(6). Accordingly, FirstEnergy's exclusive on-bill billing practice does not violate Section 2804(6).

## IV. CONCLUSION

We hold that an EDC has no duty to provide on-bill billing for non-commodity goods and services under Section 1502 of the Code or Sections 2807(c) and 2804(6) of the Competition Act. Accordingly, an EDC's use of on-bill billing for non-commodity goods and services does not constitute "service" as defined by Section 102 of the Code. In addition, we conclude that non-commodity goods and services do not constitute "electric services," and the billing thereof does not constitute "transmission and distribution service" as contemplated by these sections. As a result, FirstEnergy's exclusive practice of on-bill billing for its own non-commodity goods and services does not violate Section 1502 or Section 2804(6). As the Commonwealth Court reached the same conclusion, we affirm the order of that court.

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Mundy and McCaffery join the opinion.

Justice Mundy files a concurring opinion.

---

[12] Rather, Appellants reference cases that discussed certain billing services as a type of "public utility service." (*See, e.g.*, Appellants' Br. at 25 (citing *Aronson v. Pa. Pub. Util. Comm'n*, 740 A.2d 1208, 1211 (Pa. Cmwlth. 1999) ("PUC regulations extensively regulate *public utility services*, including information to be included in the billing statements, the late payment charges to be imposed, and the resolution of disputes between the public utility and its customers.") (emphasis added)).) As we are not called upon to interpret or define "public utility service," we do not address these cases.